JOHN W. HUBER, United States Attorney (Utah #7226)
JARED C. BENNETT, Assistant United States Attorney (Utah # 9097)
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 325-3259
Facsimile: (801) 524-6924
E-mail: jared.bennett@usdoj.gov

Ashley J. Burden, aburden@cftc.gov, *pro hac vice*
Elizabeth M. Streit, estreit@cftc.gov, *pro hac vice*
Rosemary Hollinger, rhollinger@cftc.gov, *pro hac vice*
Scott R. Williamson, swilliamson@cftc.gov, *pro hac vice*

Attorneys for Plaintiff U.S. Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
(312) 596-0700

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| U.S. Commodity Futures Trading Commission,<br><br>     Plaintiff,<br><br>       vs.<br><br>Kimball Parker; MakeYourFuture, LLC; Timothy Baggett; Changes Worldwide LLC; Changes Trading LLC,<br><br>     Defendants. | Case No. 2:16CV983-BSJ<br><br>U.S. COMMODITY FUTURES TRADING COMMISSION'S COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, CIVIL MONETARY PENALTIES, AND EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT<br><br>JURY DEMANDED<br><br>Hon. Bruce S. Jenkins |

## I. SUMMARY

1.     From at least March 2014 through the present, Defendant Kimball Parker and his

company, Defendant MakeYourFuture, LLC ("MYF"), and Defendant Timothy Baggett and his

companies, Defendants Changes Worldwide LLC ("Changes Worldwide") and Changes Trading

LLC ("Changes Trading") (together, "Changes"), engaged in a fraudulent scheme to

misrepresent the profitability and success of a futures trading system that they sold to customers.

2.    Defendants claimed on their websites, during presentations, and in

communications with individual customers, that their trading system had "never had a losing

month," and generated "300% annual returns."  In order to support these claims, Defendants

posted "documented and verifiable results" on their websites showing returns of between 11%

and 68% each month from January through December 2014.  Defendants claimed that these were

"actual results using the Changes Trading System."  Defendants also represented that they were

"professional and profitable trader[s]," and "make money on a consistent basis" using the trading

system.

3.    Defendants induced at least 289 customers to pay them more than $853,294.98 for

the trading system.

4.    In reality, Defendants' "documented and verifiable results" were false.  They did

not reflect any actual trading of real money in any futures account.

5.    Customers consistently lost money using the trading system, a fact that

Defendants were well aware of.  One customer reported losing more than $100,000.  Defendants

themselves lost tens of thousands of dollars trading futures, a material fact that they failed to

disclose to customers.

6.    Through the marketing of their trading system, Defendants have engaged, are

engaging, or are about to engage in acts and practices which violate the anti-fraud provisions of

the Commodity Exchange Act ("Act"), including Sections 4b(a)(1)(A), (B); 4$o$(1)(A), (B); and

6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (C); 6*o*(1)(A), (B); and 9(1) (2012), and Commission Regulations 4.41(a)(1)-(3), (b)(1), (2); and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.41(a)(1)-(3), (b)(1), (2); and 180.1(a)(1)-(3).

7.      Pursuant to 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act.  Given Defendants' pattern of fraudulent activity, unless restrained by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint, or to engage in similar acts and practices.  In addition, the Commission seeks restitution, disgorgement, civil monetary penalties, a permanent trading ban, and such other equitable relief as the Court may deem necessary and appropriate.

## II.  JURISDICTION AND VENUE

8.      This Commission has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1(a), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order promulgated thereunder, the Commission may bring an action in the proper District Court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, or any rule, regulation, or order thereunder.

9.      Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in the District of Utah, and the acts and practices in violation of the Act, Regulations, and the Order have occurred within this District, among other places.

### III. THE PARTIES

10.     Plaintiff U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act ("Act") and regulations promulgater thereunder ("Regulations").

11.     Defendant MakeYourFuture, LLC ("MYF") is a Utah limited liability corporation with its principal place of business in Lehi, Utah.

12.     Defendant Kimball Parker is a natural person and resides in Lehi, Utah.  Parker is the owner and controlling person of MYF.

13.     Defendant Changes Worldwide LLC ("Changes Worldwide") is a Florida limited liability corporation with its principal place of business in Lakeland, Florida.

14.     Defendant Changes Trading LLC ("Changes Trading") is a Florida limited liability corporation with its principal place of business in Lakeland, Florida.  Changes Trading is a wholly-owned subsidiary of Defendant Changes Worldwide.

15.     Defendant Timothy Baggett is a natural person and resides in Lakeland, Florida. Baggett is the owner and controlling person of Changes Worldwide, and through Changes Worldwide is the indirect owner of Changes Trading.  Baggett is the controlling person of Changes Trading.

### IV. STATUTORY AND REGULATORY BACKGROUND

**A.     Fraud by a Commodity Trading Advisor**

16.     Section 1a(12) of the Act, 7 U.S.C. § 1a(12), defines "commodity trading advisor" ("CTA"), in relevant part, as any person who: (A) for compensation or profit, engages

4

in the business of advising others, either directly or through publications, writings, or electronic

media, as to the value of or the advisability of trading in any contract of sale of a commodity for

future delivery; or (B) for compensation or profit, and as part of a regular business, issues or

promulgates analyses or reports concerning the foregoing.

17.     Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1), provides that it shall be unlawful for a

CTA, by use of the mails or any means or instrumentality of interstate commerce, directly or

indirectly: (A) to employ any device, scheme, or artifice to defraud any client or participant or

prospective client or participant; or (B) to engage in any transaction, practice, or course of

business which operates as a fraud or deceit upon any client or participant or prospective client

or participant.

18.     Commission Rule 4.41, 17 C.F.R. § 4.41(a), provides, in relevant part, that no

CTA, or any principal thereof, may advertise in a manner which: (A) employs any device,

scheme or artifice to defraud any participant or client or prospective participant or client; or

(B) involves any transaction, practice or course of business which operates as a fraud or deceit

upon any participant or client or any prospective participant or client.

19.     Commission Rule 4.41(b), 17 C.F.R. § 4.41(b), provides that no person may

present the performance of any simulated or hypothetical commodity interest account,

transaction in a commodity interest or series of transactions in a commodity interest of a CTA, or

any principal thereof, unless such performance is accompanied by the following statement:

> These results are based on simulated or hypothetical performance results that have
> certain inherent limitations.  Unlike the results shown in an actual performance
> record, these results do not represent actual trading.  Also, because these trades
> have not actually been executed, these results may have under-or over-
> compensated for the impact, if any, of certain market factors, such as lack of
> liquidity.  Simulated or hypothetical trading programs in general are also subject

to the fact that they are designed with the benefit of hindsight.  No representation is being made that any account will or is likely to achieve profits or losses similar to these being shown.

20.     Commission Rule 4.41(a)(3), 17 C.F.R. § 4.41(a)(3), provides that no CTA, or any principal thereof, may advertise in a manner which refers to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses: (A) that the testimonial may not be representative of the experience of other clients; (B) that the testimonial is no guarantee of future performance or success; and (C) if, more than a nominal sum is paid, the fact that it is a paid testimonial.

**B.     Other Anti-Fraud Statutes and Regulations under the Act**

21.     Section 4b(a) of the Act, 7 U.S.C. § 6b(a)(1)(A), (C), provides, in relevant part, that it shall be unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person, to: (A) cheat or defraud or attempt to cheat or defraud the other person; or (B) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract.

22.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), provides, in relevant part, that it shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device

or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

23.     Commission Rule 180.1, 17 C.F.R. § 180.1(a), provides, in relevant part, that it shall be unlawful for any person, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (A) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (B) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (C) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

**C.     Derivative Liability Under the Act**

24.     Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides that any person who, directly or indirectly, controls any person who has violated any provision of the Act or any of the rules, regulations, or orders issued pursuant to the Act, may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person.  In order to be held liable, the controlling person must either have (1) not acted in good faith or (2) knowingly induced, directly or indirectly, the act or acts constituting the violation.

25.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his or her employment or office shall be

deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

26.     Commission Rule 1.2, 17 C.F.R. § 1.2, provides that the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust, within the scope of his or her employment or office, shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust as well as of such official, agent, or other person.

## V.  FACTUAL BACKGROUND

**A.     The Trading System**

27.     Beginning in March 2014, Defendants offered to sell customers a system for trading the e-mini S&P 500 futures contract ("ES") on the Chicago Mercantile Exchange ("CME").

28.     The trading system consists of "signals" that purportedly provide customers with "exact entrance and exit points" for trades.  Defendants advertised the system as being "designed for both the new, inexperienced trader as well as the seasoned professional."

29.     In order to use the system, customers must download trading software from a third-party software developer and open a brokerage account.  The signals generated by Defendants' trading system "ride" on top of the third-party trading software as an add-on. According to Defendants, the signals "show you when to make the trades."

30.     The signals generated by Defendants' trading system are not available to the general public.  They are only available to customers who purchase the system.  The signals are sent to customers' computers over the internet.

8

31.     Defendants offer the trading system for a one time, up-front payment which typically ranges from $1,995 to $2,495.  In order to continue receiving the signals, customers also have to pay a monthly fee of $100.

**B.     Relationship Among Defendants**

32.     Defendant Parker is the developer of the trading system sold by Defendants. Before meeting Defendant Baggett, Parker sold his trading system through a small handful of distributors, and through MYF's website at www.1myf.com.

33.     Baggett's company, Changes Worldwide, was a multi-level marketing ("MLM") company engaged in selling various products, including vitamins, dietary supplements, insurance, and vacations, through a network of affiliates.  Affiliates are independent contractors who work to promote a product in return for commissions.  They may promote the product on the internet, or they may promote it at in-person seminars, or they may simply try to sell a product to their family or friends.

34.     Parker and Baggett met at an MLM conference in Las Vegas in late 2013.  They discussed the possibility of using Baggett's affiliate network to sell the trading system, which promised Baggett a higher profit margin than vitamins or insurance.

35.     In January 2014, Parker and Baggett entered into an arrangement for Changes Worldwide to become the primary marketer and distributor of Parker's trading system.  Parker would provide the trading system, materials for the company's website, and customer support.

36.     Baggett began marketing the trading system no later than March 2014.  Around that time, Baggett founded Changes Trading to serve as the primary vehicle through which the trading system would be marketed.

37.     Changes Worldwide and Changes Trading operated as a common enterprise during all periods relevant to the Complaint.  Changes Worldwide and Changes Trading operated as a single economic entity.  Both companies were controlled by Baggett.  The entities commingled funds, and did not operate in a manner that was distinct, nor did they deal at arms' length with one another.

38.     Changes Worldwide and Changes Trading marketed the trading system via their websites, www.changesworldwide.net, www.trading4change.com, and www.changestrading.com.  Parker provided all trading system-related content for the websites, subject to Baggett's approval.  Parker also continued to market his system through MYF's website at www.1myf.com, which was separate from the Changes websites.

39.     Defendants also marketed the trading system via sales presentations.  Some of these sales presentations occurred in-person at meetings or conferences.  Other presentations, referred to as "webinars," were broadcast over the internet.

40.     Defendants also marketed the trading system using Changes's network of more than 100 affiliates.

41.     In November 2014, Baggett ceased his marketing efforts with respect to the trading system.  Nonetheless, Baggett continued to allow Parker to use the Changes websites, which were still registered to and owned by Baggett, as well as the Changes Trading name, to market the trading system.

C.      **Defendants' Fraudulent Misrepresentations and Omissions**

**"Documented and Verifiable Results"**

42.     Defendants marketed the trading system via their websites, located at

www.changesworldwide.net, www.changestrading.com, www.trading4change.com, and

www.1myf.com.  Defendants' websites contained numerous fraudulent misrepresentations and

omissions designed to mislead customers and prospective customers into believing that the

trading system was profitable and effective.

43.     The websites claimed that Defendants' trading system has "a documented and

verifiable track record of unmatched performance in trading futures contracts (commodities)."

On a page titled "Results," Defendants invited visitors to "click the monthly charts below to see

an expanded detailed view of actual results using the Changes Trading System."

44.     The monthly charts purported to show returns of between 11% to 68% per month

between January and December 2014, and profits of between $2,830 and $17,037.50 per month

on a $25,000 trading account.  The monthly charts also purported to show the percentage of

"winning trades" generated by the system each month; these percentages ranged from 88% to

93%.

45.     Defendants made similar misrepresentations in eBooks that they distributed to

customers and prospective customers.  In the eBooks, Defendants claimed that:

> Virtually every system recommended trade for over four years has been
> documented and recorded and the performance of this proprietary trading system
> is without equal in the industry.  Over 300% annual return has been documented
> through 2014 and interested individuals can go to the archived records of CTS
> [Changes Trading] and verify every trade.

11

46.     According to the eBooks, "CTS shows subscribers and clients every system indicated trade for the past four years, with percentages of success ranging from 83% to 93% efficiency."

47.     Defendants made similar misrepresentations during presentations to customers and prospective customers.  In these presentations, Defendants claimed falsely that, "In our first 50 months, since introducing the system, we never had a losing month."

48.     In reality, the "documented and verifiable results" presented by Defendants were false.  The results touted by Defendants in the websites, eBooks, and presentations did not reflect any actual trading of real money in any futures account.

49.     Defendant Parker admitted this during the CFTC's investigation.  In a letter to the CFTC, Parker explained:

> The spreadsheets that you inquired about that are on the CT [Changes Trading] website are spreadsheets that I produce each month based upon the trading results of the system in a 'perfect world.'  It is impossible to duplicate the 'system' because of the human element.

50.     During the CFTC's investigation, Parker admitted that the results on the spreadsheets—and indeed all of the trading results touted in Defendants' promotional materials—were hypothetical and simulated.

51.     Defendant Baggett similarly was aware that the depicted "documented and verifiable results" were false.  During the CFTC's investigation, Baggett admitted that he understood the results were achievable only in a "perfect world," and that they were hypothetical and simulated.

52.     Defendants failed to include in their websites, eBooks, and presentations the disclosure for simulated or hypothetical results required by Commission Rule 4.41(b).

53.     It is untrue that Defendants have "never had a losing month."  Changes and MYF did not have trading accounts, and never traded futures.

54.     Parker and Baggett consistently lost money trading futures, suffering net losses of tens of thousands of dollars in their personal trading accounts.  During the CFTC's investigation, Defendant Parker admitted that he lost $10,000 to $11,000 a year trading futures between 2014 and 2015.  Defendants did not disclose their losses to customers or prospective customers.

### "Earn a Full Time Income"

55.     Defendants' websites claim that users of the trading system "earn a full time income working just 2 hours a day."

56.     Defendants' websites promised that:

Current users of our system regularly earn $200, $300, even $600 and $700 in a morning.  Many have reported earnings of over $1,000.  And they did it working only 2 hours a day or less, on their computers, from the comfort of their own homes.

57.     Defendants made similar misrepresentations during sales presentations, claiming that the trading system offers "[a] revolutionary new way to earn a FULL TIME INCOME in just two (2) hours a morning!"

58.     In those presentations, Defendants reported that a "realistic income" for users of the trading system would be "$200-$300 a day; [e]ven $600 or $700 a day; [s]ome have earned $1,000 or more."

59.     Defendants' claims were false.  During the CFTC's investigation, Defendants testified that they were unaware of any person who makes or has made a full-time income using the system, including Defendants themselves.

60.     Defendants testified that they were unaware of anyone who made between $200 and $1,000 a day using the trading system.

61.     In reality, most if not all of the customers who used Defendants' trading system lost money.  Baggett was aware of this, and received numerous emails from customers complaining of large financial losses.

**"Professional and Profitable Traders"**

62.     Defendants made numerous misrepresentations to customers and prospective customers about Defendants' success as traders.

63.     In the eBooks Defendants distributed, Defendants claimed that:

We enjoy trading in our personal accounts and to date we run a very high rate of success.  Even though we do make money in our personal accounts, we are by nature - very conservative traders.  The main reason for starting Changes Trading Systems is that by sharing this knowledge; and the tools of success with others, we will be personally compensated as business owners, but we will also be able to help hundreds, if not thousands, of people in their own personal quest for financial freedom.

64.     Defendants made similar misrepresentations in communications with individual customers.

65.     For example, in a June 21, 2014 email, Defendant Parker told a customer that he "discovered patterns that applied to the futures market and [ ] finally started to make money on a consistent basis."  "That was over 4 years ago," Parker exclaimed, "and I have been a professional and profitable trader since then."  "The system has been around for over 4 years and we have losing trades and losing days but have never had a losing month!  There is hope!"

14

66.     In an August 31, 2015 email, Parker told a customer that, "I use the MYF indicators exclusively.  I have tried many systems and this is the only one that I can consistently make money with ....  The system really works but you must believe in it first!"

67.     Parker told another customer that the trading system "set him free," and had given him "financial independence."

68.     In reality, Defendants were not successful or profitable traders.  As set forth above, Defendants consistently lost money attempting to trade futures.

### Customer Testimonial

69.     Defendants' websites include a testimonial from a customer identified only as "B.F."  The testimonial states:

> As a retired stock broker I planned on adding to my retirement income by Day Trading.  I soon found that futures trading was outside of my area of expertise. Thankfully, I found the system and have enjoyed making money on a consistent basis.  I'm beginning my 3rd year with the Company and plan on using this amazing system well into the future.

70.     On information and belief, there is no such person as B.F., and the testimonial was fabricated by Defendants.

71.     During the CFTC investigation, Defendants testified that they did not know who B.F. was, or where the testimonial came from.  Defendants were unable to identify any customer who made money "on a consistent basis" using the trading system.

72.     Defendants' websites failed to include the disclosure for customer testimonials required by Commission Rule 4.41(a)(3).

**The Live Training Room**

73.     On and off between June 2014 and August 2015, Defendants offered customers access to what they referred to as the "live training room."  For an additional $150 a month, customers could "'look over the shoulder' online of an experienced trader who is using our system."

74.     According to Defendants' websites, the live training room was "ongoing training in a 'real world' environment to show you how to capitalize on all the advantages to be had using our proven system."  Defendants represented to customers that:

> This service will show you professional Traders using the CTS Trading System and will flatten the "learning curve," considerably with reference to time.  For example, most new and inexperienced Traders will require 4 to 6 months of learning and demo trading practice ….  That learning process can be reduced by several months in many instances by attending the live training room and watching the live application of the system in actual trading situations.

75.     The traders in the live training room purported to trade along with the signals generated by Defendants' system.  These traders always or almost always appeared to make a profit using the system.

76.     The traders in the training room assured viewers that they were trading with "real money," and that real money was "on the line."

77.     The live training room was actually part of Defendants' fraudulent scheme to convince customers that the trading system was profitable so they would continue paying the monthly fee for signals.

78.     In reality, the traders in the live training room were not professional traders.  One of the so-called traders was Defendants' IT person, who had never traded in his life before going to work for Defendants.

16

79.     Contrary to Defendants' representations, the individuals in the trading room were not trading with "real money."  Rather, they were trading mostly if not exclusively in "sim" mode, which allowed them to achieve simulated profits that would be impossible in real life.

**The Robot**

80.     Between July and November 2014, Defendants offered customers the opportunity to purchase and download the "Opening Bell Robot Trading System," also referred to as the "robot."

81.     Once activated by a customer, the robot would automatically place trades via the customer's brokerage account according to signals generated by Defendants' trading system.

82.     Defendants extolled the virtues of the robot on their websites.  "Using our proven and proprietary algorithm," Defendants exclaimed, "your Robot knows exactly what to do, and when to do it.  You just set it and forget it… and make money!  Our New Robotic Trading System also includes the GOLDEN Trade, which has been documented to have a +90% success rate!"

83.     In reality, there was no 90% success rate for the robot.  During the CFTC's investigation, Defendants acknowledged that the robot did not work, and that customers lost money attempting to use it.

84.     Defendant Parker admitted in testimony that the robot had never been tested using real money.  Parker admitted in the CFTC's investigation that he knew customers would lose money using the robot, and that the robot was "dangerous."  Parker nonetheless allowed Defendants to offer the robot for sale to customers.

17

85.     The programmer who developed the robot warned Parker that the robot would not be "consistently or significantly profitable."  In subsequent emails, the programmer acknowledged that "consistently profitable futures robots are mythical creatures."

**D.     Customer Losses**

86.     Since March 2014, at least 289 customers paid Defendants a total of $853,249.98 for the use of the trading system and ancillary services.

87.     Customers suffered unknown trading losses as a result of using the trading system.

**E.     Ongoing Conduct**

88.     In February 2016, Defendant Parker held a webinar for customers to discuss the CFTC's investigation of Defendants.  In the webinar, Parker assured customers that the CFTC's investigation was a "witch hunt" and that he had done nothing wrong.

89.     As of August 2016, Parker is still offering the trading system for sale to the public via MYF's website.  The Changes websites are no longer active.

90.     Upon information and belief, Parker is continuing to display false trading results and other misrepresentations in the members-only portion of the website, which requires login credentials to access.

18

# VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNT I

**Defendants Changes Trading, Changes Worldwide, and MYF Defrauded their Customers in Violation of 7 U.S.C. § 6*o*(1)(A), (B) and 17 C.F.R. § 4.41(a)(1), (2)**

91.     The foregoing paragraphs are realleged and incorporated by reference as if fully set forth herein.

92.     Defendants Changes Trading, Changes Worldwide, and MYF, through the sale of their trading system and ancillary services, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery, or, for compensation or profit, and as part of a regular business, issued or promulgated analyses or reports concerning the advisability of trading in any contract of sale of a commodity for future delivery.  As such, Defendants Changes Trading, Changes Worldwide, and MYF acted as CTAs within the meaning of Section 1a(12) of the Act.  7 U.S.C. § 1a(12).

93.     Defendants Changes Trading, Changes Worldwide, and MYF, by the use of the mails, the internet, and other instrumentalities of interstate commerce, and via the misrepresentations and omissions described in paragraphs 42 through 90 above, directly or indirectly (A) employed a device, scheme, or artifice to defraud customers or prospective customers, and prospective clients or participants; or (B) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon customers or prospective customers, in violation of Section 4*o*(1) of the Act.  7 U.S.C. § 6*o*(1)(A), (B).

94.     Through the conduct alleged in paragraphs 42 through 90, Defendants Changes Trading, Changes Worldwide, and MYF, while acting as CTAs, advertised in a manner which:

(1) employed a device, scheme or artifice to defraud customers or prospective customers; or

(2) involved transactions, practices or courses of business which operated as a fraud or deceit

upon customers or prospective customers, in violation of Commission Rule 4.41(a).  17 C.F.R.

§ 4.41(a)(1), (2).

95.     During all times relevant to the Complaint, Defendant Parker directly or indirectly

controlled Defendant MYF.  Parker knowingly induced MYF's violations of the Act, or failed to

act in good faith with respect to such violations.  Parker is therefore liable for violations of the

Act committed by MYF under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

96.     During all times relevant to the Complaint, Defendant Baggett directly or

indirectly controlled Defendants Changes Trading and Changes Worldwide.  Baggett knowingly

induced Changes's violations of the Act, or failed to act in good faith with respect to such

violations.  Baggett is therefore liable for violations of the Act committed by Changes under

Section 13(b) of the Act.  7 U.S.C. § 13c(b).

97.     Defendants Changes Trading, Changes Worldwide, and MYF are liable for the

acts of their employees and agents under Section 2(a)(1)(B) of the Act and Commission Rule

1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

98.     During all times relevant to the Complaint, Defendant Parker acted as an agent of

Changes.  Changes is therefore liable for Parker's actions pursuant to Section 2(a)(1)(B) of the

Act and Commission Rule 1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

99.     Each fraudulent misrepresentation or omission made by Changes Trading,

Changes Worldwide, and MYF, including but not limited to those specifically alleged herein,

constitutes a separate and distinct violation of the Act.

## COUNT II

**Defendants Changes Trading, Changes Worldwide, and MYF Failed to Make Required Disclosures in Violation of 17 C.F.R. § 4.41(a)(3), (b)(1), (2)**

100.     The foregoing paragraphs are realleged and incorporated by reference as if fully set forth herein.

101.     As set forth above in paragraph 92, Defendants Changes Trading, Changes Worldwide, and MYF are CTAs within the meaning of Section 1a(12) of the Act.

102.     As set forth in paragraphs 42 through 52 and 73 through 79, Defendants Changes Trading, Changes Worldwide, and MYF presented the performance of simulated or hypothetical trading in commodity futures without prominently displaying the required disclosures set forth in Commission Rule 4.41(b).  17 C.F.R. § 4.41(b).

103.     As set forth in paragraphs 69 through 72, Defendants Changes Trading, Changes Worldwide, and MYF advertised in a manner which referred to a testimonial without prominently displaying the required disclosures set forth in Commission Rule 4.41(a)(3). 17 C.F.R. § 4.41(a)(3).

104.     During all times relevant to the Complaint, Defendant Parker directly or indirectly controlled Defendant MYF.  Parker knowingly induced MYF's violations of the Act, or failed to act in good faith with respect to such violations.  Parker is therefore liable for violations of the Act committed by MYF under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

105.     During all times relevant to the Complaint, Defendant Baggett directly or indirectly controlled Defendants Changes Trading and Changes Worldwide.  Baggett knowingly induced Changes's violations of the Act, or failed to act in good faith with respect to such

violations.  Baggett is therefore liable for violations of the Act committed by Changes

Worldwide or Changes Trading under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

106.    Defendants Changes Trading, Changes Worldwide, and MYF are liable for the

acts of their employees and agents under Section 2(a)(1)(B) of the Act and Commission Rule

1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

107.    During all times relevant to the Complaint, Defendant Parker acted as an agent of

Changes.  Changes is therefore liable for Parker's actions pursuant to Section 2(a)(1)(B) of the

Act and Commission Rule 1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

108.    Each fraudulent misrepresentation or omission made by Defendants Changes

Trading, Changes Worldwide, and MYF, including but not limited to those specifically alleged

herein, constitutes a separate and distinct violation of the Act.

## COUNT III

**Defendants Changes Trading, Changes Worldwide, Parker, and MYF Defrauded Their
Customers in Violation of 7 U.S.C. § 6b(a)(1)(A), (C)**

109.    The foregoing paragraphs are realleged and incorporated by reference as if fully

set forth herein.

110.    Defendants Changes Trading, Changes Worldwide, Parker, and MYF, via the

misrepresentations and omissions described in paragraphs 42 through 90 above, cheated or

defrauded, or attempted to cheat or defraud, customers and prospective customers in connection

with any order to make, or the making of, any contract of sale of any commodity in interstate

commerce or for future delivery that is made, or to be made, on or subject to the rules of a

designated contract market, in violation of Section 4b(a) of the Act.  7 U.S.C. § 6b(a)(1)(A), (C).

111.    During all times relevant to the Complaint, Defendant Parker directly or indirectly controlled Defendant MYF.  Parker knowingly induced MYF's violations of the Act, or failed to act in good faith with respect to such violations.  Parker is therefore liable for violations of the Act committed by MYF under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

112.    During all times relevant to the Complaint, Defendant Baggett directly or indirectly controlled Defendants Changes Trading and Changes Worldwide.  Baggett knowingly induced Changes' violations of the Act, or failed to act in good faith with respect to such violations.  Baggett is therefore liable for violations of the Act committed by Changes Worldwide or Changes Trading under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

113.    Defendants Changes Trading, Changes Worldwide, Parker, and MYF are liable for the acts of their employees and agents under Section 2(a)(1)(B) of the Act and Commission Rule 1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

114.    During all times relevant to the Complaint, Defendant Parker acted as an agent of Changes.  Changes is therefore liable for Parker's actions pursuant to Section 2(a)(1)(B) of the Act and Commission Rule 1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

115.    Each fraudulent misrepresentation or omission made by Defendants Changes Trading, Changes Worldwide, Parker, and MYF, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of the Act.

## COUNT IV

**Defendants Changes Trading, Changes Worldwide, Parker, and MYF Defrauded Their Customers in Violation of 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1**

116.    The foregoing paragraphs are realleged and incorporated by reference as if fully set forth herein.

23

117.    Defendants Changes Trading, Changes Worldwide, Parker, and MYF, via the misrepresentations and omissions described in paragraphs 42 through 90 above, directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (2) made, or attempted to make, untrue or misleading statements of a material fact or omitted to state material facts necessary in order to make the statements made not untrue or misleading; or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon customers or prospective customers, in violation of Section 6(c) of the Act, and Commission Rule 180.1(a).  7 U.S.C. § 9(1), 17 C.F.R. § 180.1(a)(1)-(3).

118.    During all times relevant to the Complaint, Defendant Parker directly or indirectly controlled Defendant MYF.  Parker knowingly induced MYF's violations of the Act, or failed to act in good faith with respect to such violations.  Parker is therefore liable for violations of the Act committed by MYF under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

119.    During all times relevant to the Complaint, Defendant Baggett directly or indirectly controlled Defendants Changes Trading and Changes Worldwide.  Baggett knowingly induced Changes' violations of the Act, or failed to act in good faith with respect to such violations.  Baggett is therefore liable for violations of the Act committed by Changes Worldwide or Changes Trading under Section 13(b) of the Act.  7 U.S.C. § 13c(b).

120.    Defendants Changes Trading, Changes Worldwide, Parker, and MYF are liable for the acts of their employees and agents under Section 2(a)(1)(B) of the Act and Commission Rule 1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

121.    During all times relevant to the Complaint, Defendant Parker acted as an agent of Changes.  Changes is therefore liable for Parker's actions pursuant to Section 2(a)(1)(B) of the Act and Commission Rule 1.2.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2.

122.    Each fraudulent misrepresentation or omission made by Defendants Changes Trading, Changes Worldwide, Parker, and MYF, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of the Act.

## VII.        PRAYER FOR RELIEF

123.    WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to the Court's inherent equitable powers, enter:

a.      An order finding that Defendants violated: Sections 4b(a)(1)(A), (B); 4*o*(1)(A), (B); and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (C); 6*o*(1)(A), (B); and 9(1) (2012), and Commission Regulations 4.41(a)(1)-(3), (b)(1), (2); and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.41(a)(1)-(3), (b)(1), (2); and 180.1(a)(1)-(3).

b.      Orders of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct that violates: Sections 4b(a)(1)(A), (B); 4*o*(1)(A), (B); and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(1)(A), (C); 6*o*(1)(A), (B); and 9(1) (2012), and Commission Regulations 4.41(a)(1)-(3),

(b)(1), (2); and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.41(a)(1)-(3), (b)(1), (2); and 180.1(a)(1)-(3).

c.    Orders of preliminary injunction against Defendants Parker and MYF and permanent injunction against all Defendants, and any of their agents, servants, employees, successors, assigns, attorneys, and persons acting in active concert or participation with Defendants, including any successor thereof, from, directly or indirectly:

    i.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

    ii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. §1.3(yy)) for their own personal account or for any account in which they have a direct or indirect interest;

    iii.    Having any commodity interests traded on their behalf;

    iv.    Controlling or directing the trading for, or on behalf of, any other person or entity, whether directly or indirectly, by power of attorney or otherwise, in any account involving commodity interests;

    v.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    vi.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

vii. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person or entity registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

d. An order directing Defendants, as well as any successors thereof, to make full disgorgement of all benefits received including, but not limited to salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

e. An order requiring Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received, or caused another person or entity to receive, as a result of the acts or practices that constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

f. An order directing Defendants, as well as any successors thereof, to pay a civil monetary penalty, plus post-judgment interest, for each violation of the Act and Regulations described herein, in the amount of: (i) $152,243 for each violation committed, 17 C.F.R. § 143.8(a)(1)(ii)(D), or triple Defendants' monetary gain,

27

whichever is greater, for Counts I through III; and (ii) $1,098,190 or triple the monetary gain to Defendants, which whichever is greater, for Count IV.

g.     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

h.     Such other and further relief as the Court deems proper.

Respectfully submitted,

JOHN W. HUBER
United States Attorney

/s/ Jared C. Bennett
JARED C. BENNETT
Assistant United States Attorney

Ashley J. Burden, aburden@cftc.gov, *pro hac vice*
Elizabeth M. Streit, estreit@cftc.gov, *pro hac vice*
Rosemary Hollinger, rhollinger@cftc.gov, *pro hac vice*
Scott R. Williamson, swilliamson@cftc.gov, *pro hac vice*

Attorneys for Plaintiff
U.S. Commodity Futures Trading Commission
525 W. Monroe St.
Chicago, IL 60661
(312) 596-0700

28