IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| U.S. Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>vs.<br><br>Kimball Parker; MakeYourFuture, LLC; Timothy Baggett; Changes Worldwide LLC; Changes Trading LLC,<br><br>Defendants. | Case No. 2:16-cv-00983-BSJ<br><br>CONSENT ORDER FOR PERMANENT INJUNCTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS KIMBALL PARKER AND MAKEYOURFUTURE, LLC<br><br>Hon. Bruce S. Jenkins |

## I.    INTRODUCTION

On September 21, 2016, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendants Kimball Parker, MakeYourFuture, LLC, Timothy Baggett, Changes Worldwide LLC, and Changes Trading LLC, seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. § 1.1 et seq. (2016).  The Court entered a preliminary injunction against Defendants Parker and MakeYourFuture, Inc. ("MYF") on September 29, 2016.  The Court entered a final judgment by default, permanent injunction, civil monetary penalties, and other statutory and equitable relief against Defendants Baggett, Changes Worldwide LLC ("Changes Worldwide"), and Changes Trading LLC ("Changes Trading") on February 1, 2017.

## II.    CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendants Parker
and MYF without a trial on the merits or any further judicial proceedings, Defendants Parker and
MYF:

1.    Consent to the entry of this Consent Order for Permanent Injunction, Civil
Monetary Penalty and Other Equitable Relief Against Defendants Parker and MYF ("Consent
Order");

2.    Affirm that they have read and agreed to this Consent Order voluntarily, and that
no promise, other than as specifically contained herein, or threat, has been made by the
Commission or any member, officer, agent or representative thereof, or by any other person, to
induce consent to this Consent Order;

3.    Acknowledge service of the summons and Complaint;

4.    Admit the jurisdiction of this Court over Defendants Parker and MYF and the
subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012);

5.    Admit the jurisdiction of the CFTC over the conduct and transactions at issue in
this action pursuant to the Act, 7 U.S.C. §§ 1-26 (2012);

6.    Admit that venue properly lies with this Court pursuant to Section 6c(e) of the
Act, 7 U.S.C. § 13a-1(e) (2012);

7.    Waive:

a.    Any and all claims that Defendant Parker and MYF may possess under the Equal

Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or

the rules promulgated by the Commission in conformity therewith, Part 148 of the

Regulations, 17 C.F.R. §§ 148.1 *et seq.* (2016), relating to, or arising from, this

action;

2

b. Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

c. Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

d. Any and all rights of appeal from this action;

8. Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendants Parker or MYF now or in the future reside outside the jurisdiction of this Court;

9. Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waive any objection based thereon;

10. Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the CFTC is not a party. Defendants Parker and MYF shall undertake all steps necessary to ensure

3

that all of their agents and/or employees under their authority or control understand and comply with this agreement;

11. By consenting to the entry of this Consent Order, neither admit nor deny the allegations of the Complaint or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which they admit. Further, Defendants Parker and MYF agree and intend that the allegations contained in the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: (a) any current or subsequent bankruptcy proceeding filed by, on behalf of, or against Defendant Parker or MYF; (b) any proceeding pursuant to Section 8a of the Act, 7 U.S.C. § 12a (2012), and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 – 3.75 (2016); (c) any proceeding to enforce the terms of this Consent Order; and/or (d) any action against a potential relief defendant or to set aside transfers, including any future action against any person to whom such transfers were made by or at the behest of Defendant Parker or MYF. Defendants Parker and MYF do not consent to the use of this Consent Order, or the Findings of Fact and Conclusions of Law in this Consent Order, as the sole basis for any other proceeding brought by the Commission, except for an action against a relief defendant or to set aside transfers, pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, or other statute, where such transfers were made by or at the behest of Defendant Parker or MYF;

12. Agree to provide immediate notice to this Court and the CFTC by certified mail, in the manner required by paragraph 102 of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against them, whether inside or outside the United States;

4

13.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants Parker or MYF in any other proceeding.

## III.     FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), as set forth herein. The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.     Findings of Fact**

### Parties to this Consent Order

14.     Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1, *et seq.* (2016).

15.     Defendant MakeYourFuture, LLC ("MYF") is a Utah limited liability corporation with its principal place of business in Lehi, Utah. MYF has never been registered with the Commission in any capacity.

16.     Defendant Kimball Parker is a natural person and resides in Lehi, Utah. Parker is the owner and controlling person of MYF. Parker has never been registered with the Commission in any capacity.

5

**Non-Parties to the Consent Order**

17.     Defendant Changes Worldwide LLC ("Changes Worldwide") is a Florida limited liability corporation with its principal place of business in Lakeland, Florida. Changes Worldwide has never been registered with the Commission in any capacity.

18.     Defendant Changes Trading LLC ("Changes Trading") is a Florida limited liability corporation with its principal place of business in Lakeland, Florida. Changes Trading is a wholly-owned subsidiary of Defendant Changes Worldwide. Changes Trading has never been registered with the Commission in any capacity.

19.     Defendant Timothy Baggett is a natural person and resides in Lakeland, Florida. Baggett is the owner and controlling person of Changes Worldwide, and through Changes Worldwide is the indirect owner of Changes Trading. Baggett is the controlling person of Changes Trading. Baggett has never been registered with the Commission in any capacity.

20.     Changes Worldwide and Changes Trading (collectively, "Changes") operated as a common enterprise during all periods relevant to the Complaint.

21.     The Court entered a final judgment by default, permanent injunction, civil monetary penalties, and other statutory and equitable relief against Defendants Baggett, Changes Worldwide, and Changes Trading on February 1, 2017. (Doc. 33)

**The Trading System**

22.     Beginning in March 2014, Defendants Parker, MYF, Baggett, Changes Worldwide, and Changes Trading (collectively, "Defendants") offered to sell customers a system for trading the e-mini S&P 500 futures contract ("ES") on the Chicago Mercantile Exchange ("CME").

23. The trading system consists of "signals" that purportedly provide customers with "exact entrance and exit points" for trades. Defendants advertised the system as being "designed for both the new, inexperienced trader as well as the seasoned professional."

24. In order to use the system, customers must download trading software from a third-party software developer and open a brokerage account. The signals generated by Defendants' trading system "ride" on top of the third-party trading software as an add-on. According to Defendants, the signals "show you when to make the trades."

25. The signals generated by Defendants' trading system are not available to the general public. They are only available to customers who purchase the system. The signals are sent to customers' computers over the internet.

26. Defendants offer the trading system for a one time, up-front payment which typically ranges from $1,995 to $2,495. In order to continue receiving the signals, customers also have to pay a monthly fee of $100.

**Relationship Among Defendants**

27. Defendant Parker is the developer of the trading system sold by Defendants. Before meeting Defendant Baggett, Parker sold his trading system through a small handful of distributors, and through MYF's website at www.1myf.com.

28. Baggett's company, Changes Worldwide, was a multi-level marketing ("MLM") company engaged in selling various products, including vitamins, dietary supplements, insurance, and vacations, through a network of affiliates. Affiliates are independent contractors who work to promote a product in return for commissions. They may promote the product on the internet, or they may promote it at in-person seminars, or they may simply try to sell a product to their family or friends.

7

29.     Parker and Baggett met at an MLM conference in Las Vegas in late 2013. They discussed the possibility of using Baggett's affiliate network to sell the trading system, which promised Baggett a higher profit margin than vitamins or insurance.

30.     In January 2014, Parker and Baggett entered into an arrangement for Changes Worldwide to become the primary marketer and distributor of Parker's trading system. Parker would provide the trading system, materials for the company's website, and customer support.

31.     Baggett began marketing the trading system no later than March 2014. Around that time, Baggett founded Changes Trading to serve as the primary vehicle through which the trading system would be marketed.

32.     Changes Worldwide and Changes Trading marketed the trading system via their websites, www.changesworldwide.net, www.trading4change.com, and www.changestrading.com. Parker provided all trading system-related content for the websites, subject to Baggett's approval. Parker also continued to market his system through MYF's website at www.1myf.com, which was separate from the Changes websites.

33.     Defendants also marketed the trading system via sales presentations. Some of these sales presentations occurred in-person at meetings or conferences. Other presentations, referred to as "webinars," were broadcast over the internet. Defendants also marketed the trading system using Changes's network of more than 100 affiliates.

34.     In November 2014, Baggett ceased his marketing efforts with respect to the trading system. Nonetheless, Baggett continued to allow Parker to use the Changes websites, which were still registered to and owned by Baggett, as well as the Changes Trading name, to market the trading system.

**"Documented and Verifiable Results"**

35.     Defendants marketed the trading system via their websites, located at www.changesworldwide.net, www.changestrading.com, www.trading4change.com, and www.1myf.com. Defendants' websites contained numerous fraudulent misrepresentations and omissions designed to mislead customers and prospective customers into believing that the trading system was profitable and effective.

36.     The websites claimed that Defendants' trading system has "a documented and verifiable track record of unmatched performance in trading futures contracts (commodities)." On a page titled "Results," Defendants invited visitors to "click the monthly charts below to see an expanded detailed view of actual results using the Changes Trading System."

37.     The monthly charts purported to show returns of between 11% to 68% per month between January and December 2014, and profits of between $2,830 and $17,037.50 per month on a $25,000 trading account. The monthly charts also purported to show the percentage of "winning trades" generated by the system each month; these percentages ranged from 88% to 93%.

38.     Defendants made similar misrepresentations in eBooks that they distributed to customers and prospective customers. In the eBooks, Defendants claimed that:

> Virtually every system recommended trade for over four years has been documented and recorded and the performance of this proprietary trading system is without equal in the industry. Over 300% annual return has been documented through 2014 and interested individuals can go to the archived records of CTS [Changes Trading] and verify every trade.

39.     According to the eBooks, "CTS shows subscribers and clients every system indicated trade for the past four years, with percentages of success ranging from 83% to 93% efficiency."

40.     Defendants made similar misrepresentations during presentations to customers and prospective customers.  In these presentations, Defendants claimed falsely that, "In our first 50 months, since introducing the system, we never had a losing month."

41.     In reality, the "documented and verifiable results" presented by Defendants were false.  The results touted by Defendants in the websites, eBooks, and presentations did not reflect any actual trading of real money in any futures account.

42.     Defendant Parker admitted this during the CFTC's investigation.  In a letter to the CFTC, Parker explained:

> The spreadsheets that you inquired about that are on the CT [Changes Trading] website are spreadsheets that I produce each month based upon the trading results of the system in a 'perfect world.'  It is impossible to duplicate the 'system' because of the human element.

43.     During the CFTC's investigation, Parker admitted that the results on the spreadsheets—and indeed all of the trading results touted in Defendants' promotional materials—were hypothetical and simulated.

44.     Defendant Baggett similarly was aware that the depicted "documented and verifiable results" were false.  During the CFTC's investigation, Baggett admitted that he understood the results were achievable only in a "perfect world," and that they were hypothetical and simulated.

45.     Defendants failed to include in their websites, eBooks, and presentations the disclosure for simulated or hypothetical results required by Commission Rule 4.41(b).

46.     It is untrue that Defendants have "never had a losing month."  Changes and MYF did not have trading accounts, and never traded futures.

47.     Parker and Baggett consistently lost money trading futures, suffering net losses of tens of thousands of dollars in their personal trading accounts.  During the CFTC's investigation,

Defendant Parker admitted that he lost $10,000 to $11,000 a year trading futures between 2014 and 2015. Defendants did not disclose their losses to customers or prospective customers.

## "Earn a Full Time Income"

48. Defendants' websites claim that users of the trading system "earn a full time income working just 2 hours a day." Defendants' websites promised that:

> Current users of our system regularly earn $200, $300, even $600 and $700 in a morning. Many have reported earnings of over $1,000. And they did it working only 2 hours a day or less, on their computers, from the comfort of their own homes.

49. Defendants made similar misrepresentations during sales presentations, claiming that the trading system offers "[a] revolutionary new way to earn a FULL TIME INCOME in just two (2) hours a morning!" In those presentations, Defendants reported that a "realistic income" for users of the trading system would be "$200-$300 a day; [e]ven $600 or $700 a day; [s]ome have earned $1,000 or more."

50. Defendants' claims were false. During the CFTC's investigation, Defendants testified that they were unaware of any person who makes or has made a full-time income using the system, including Defendants themselves. Defendants testified that they were unaware of anyone who made between $200 and $1,000 a day using the trading system.

51. In reality, most if not all of the customers who used Defendants' trading system lost money.

## "Professional and Profitable Traders"

52. Defendants made numerous misrepresentations to customers and prospective customers about Defendants' success as traders. In the eBooks Defendants distributed, Defendants claimed that:

> We enjoy trading in our personal accounts and to date we run a very high rate of success. Even though we do make money in our personal accounts, we are by

11

nature - very conservative traders. The main reason for starting Changes Trading Systems is that by sharing this knowledge; and the tools of success with others, we will be personally compensated as business owners, but we will also be able to help hundreds, if not thousands, of people in their own personal quest for financial freedom.

53.　　Defendants made similar misrepresentations in communications with individual customers. For example, in a June 21, 2014 email, Defendant Parker told a customer that he "discovered patterns that applied to the futures market and [ ] finally started to make money on a consistent basis." "That was over 4 years ago," Parker exclaimed, "and I have been a professional and profitable trader since then." "The system has been around for over 4 years and we have losing trades and losing days but have never had a losing month! There is hope!"

54.　　In an August 31, 2015 email, Parker told a customer that, "I use the MYF indicators exclusively. I have tried many systems and this is the only one that I can consistently make money with .... The system really works but you must believe in it first!" Parker told another customer that the trading system "set him free," and had given him "financial independence."

55.　　In reality, Defendants were not successful or profitable traders. As set forth above, Defendants consistently lost money attempting to trade futures.

**Customer Testimonial**

56.　　Defendants' websites include a testimonial from a customer identified only as "B.F." The testimonial states:

> As a retired stock broker I planned on adding to my retirement income by Day Trading. I soon found that futures trading was outside of my area of expertise. Thankfully, I found the system and have enjoyed making money on a consistent basis. I'm beginning my 3rd year with the Company and plan on using this amazing system well into the future.

57.　　There is no such person as B.F., and the testimonial was fabricated by Defendants.

12

58. During the CFTC investigation, Defendants testified that they did not know who B.F. was, or where the testimonial came from. Defendants were unable to identify any customer who made money "on a consistent basis" using the trading system.

59. Defendants' websites failed to include the disclosure for customer testimonials required by Commission Rule 4.41(a)(3), 17 C.F.R. § 4.41(a)(3).

## The Live Training Room

60. On and off between June 2014 and August 2015, Defendants offered customers access to what they referred to as the "live training room." For an additional $150 a month, customers could "'look over the shoulder' online of an experienced trader who is using our system."

61. According to Defendants' websites, the live training room was "ongoing training in a 'real world' environment to show you how to capitalize on all the advantages to be had using our proven system." Defendants represented to customers that:

> This service will show you professional Traders using the CTS Trading System and will flatten the "learning curve," considerably with reference to time. For example, most new and inexperienced Traders will require 4 to 6 months of learning and demo trading practice .... That learning process can be reduced by several months in many instances by attending the live training room and watching the live application of the system in actual trading situations.

62. The traders in the live training room purported to trade along with the signals generated by Defendants' system. These traders always or almost always appeared to make a profit using the system. The traders in the training room assured viewers that they were trading with "real money," and that real money was "on the line."

63. The live training room was actually part of Defendants' fraudulent scheme to convince customers that the trading system was profitable so they would continue paying the monthly fee for signals. In reality, the traders in the live training room were not professional

traders. One of the so-called traders was Defendants' IT person, who had never traded in his life before going to work for Defendants.

64. Contrary to Defendants' representations, the individuals in the trading room were not trading with "real money." Rather, they were trading mostly if not exclusively in "sim" mode, which allowed them to achieve simulated profits that would be impossible in real life.

### The Robot

65. Between July and November 2014, Defendants offered customers the opportunity to purchase and download the "Opening Bell Robot Trading System," also referred to as the "robot." Once activated by a customer, the robot would automatically place trades via the customer's brokerage account according to signals generated by Defendants' trading system.

66. Defendants extolled the virtues of the robot on their websites. "Using our proven and proprietary algorithm," Defendants exclaimed, "your Robot knows exactly what to do, and when to do it. You just set it and forget it... and make money! Our New Robotic Trading System also includes the GOLDEN Trade, which has been documented to have a +90% success rate!"

67. In reality, there was no 90% success rate for the robot. During the CFTC's investigation, Defendants acknowledged that the robot did not work, and that customers lost money attempting to use it.

68. Defendant Parker admitted in testimony that the robot had never been tested using real money. Parker admitted in the CFTC's investigation that he knew customers would lose money using the robot, and that the robot was "dangerous." Parker nonetheless allowed Defendants to offer the robot for sale to customers.

14

69. The programmer who developed the robot warned Parker that the robot would not be "consistently or significantly profitable." In subsequent emails, the programmer acknowledged that "consistently profitable futures robots are mythical creatures."

## Customer Losses

70. Since March 2014, at least 289 customers paid Defendants a total of $853,249.98 for the use of the trading system and ancillary services. Customers also suffered trading losses as a result of using the trading system.

## Fraudulent Transfer

71. On August 26, 2016, Defendant Kimball Parker transferred one hundred five thousand dollars ($105,000) to an account in the name of his wife ("Transfer"). Parker's wife then used that money to purchase stock in her name in Standard Oil, Inc., a West Virginia Corporation.

72. Defendant Parker made the Transfer to his wife in order to hinder, delay, and defraud his creditors, including the CFTC. Defendant Parker did not receive any consideration or reasonably equivalent value from his wife or any other person in return for the Transfer.

**B. Conclusions of Law**

73. This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

74. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because the Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

## Fraud By a Commodity Trading Advisor

75. By the conduct described in paragraphs 22 through 70 above, Defendant MYF, through the sale of the trading system and ancillary services, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery, or, for compensation or profit, and as part of a regular business, issued or promulgated analyses or reports concerning the advisability of trading in any contract of sale of a commodity for future delivery. As such, Defendant MYF acted as a commodity trading advisor ("CTA") within the meaning of Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2012).

76. By the conduct described in paragraphs 22 through 70 above, Defendant MYF, by the use of the mails, the internet, and other instrumentalities of interstate commerce, and via the misrepresentations and omissions, directly or indirectly (A) employed a device, scheme, or artifice to defraud customers or prospective customers, and prospective clients or participants; or (B) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon customers or prospective customers, in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1)(A), (B) (2012).

77. By the conduct described in paragraphs 22 through 70 above, Defendant MYF, while acting as a CTA, advertised in a manner which: (A) employed a device, scheme or artifice to defraud customers or prospective customers; or (B) involved transactions, practices or courses of business which operated as a fraud or deceit upon customers or prospective customers, in violation of Regulation 4.41(a), 17 C.F.R. § 4.41(a)(1), (2) (2016).

16

## Failure to Make Required Disclosures

78.     By the conduct described in paragraphs 35 through 47 above, Defendant MYF presented the performance of simulated or hypothetical trading in commodity futures without prominently displaying the disclosures required of a CTA in Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2016).

79.     By the conduct described in paragraphs 56 through 59 above, Defendant MYF advertised in a manner which referred to a testimonial without prominently displaying the disclosures required of a CTA in Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3) (2016).

## Fraudulent Misrepresentations and Omissions

80.     By the conduct described in paragraphs 22 through 70 above, Defendants Parker and MYF cheated or defrauded, or attempted to cheat or defraud, customers and prospective customers in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, in violation of Section 4b(a) of the Act, 7 U.S.C. § 6b(a)(1)(A), (C) (2012).

81.     By the conduct described in paragraphs 22 through 70 above, Defendants Parker and MYF directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly: (A) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (B) made, or attempted to make, untrue or misleading statements of a material fact or omitted to state material facts necessary in order to make the statements made not untrue or misleading; or (C) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or

17

deceit upon customers or prospective customers, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(1)-(3).

****

82.     Defendant Kimball Parker controlled Defendant MYF, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, MYF's act or acts in violation of the Act and Regulations; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Defendant Parker is liable for MYF's violations of:

a.     Section 4o(1) of the Act, 7 U.S.C. § 6o(1)(A), (B) (2012), and Regulation 4.41(a), 17 C.F.R. § 4.41(a)(1), (2);

b.     Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2016), and Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3) (2016);

c.     Section 4b(a) of the Act, 7 U.S.C. § 6b(a)(1)(A), (C) (2012);

d.     Section 6(c) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(1)-(3).

83.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants Parker and MYF will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## IV.     PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

84.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), Defendants Parker and MYF are permanently restrained, enjoined and prohibited from directly or indirectly:

a. While acting as a CTA , directly or indirectly, by the use of the mails, the internet, and other instrumentalities of interstate commerce: (A) employing a device, scheme, or artifice to defraud customers or prospective customers, and prospective clients or participants; or (B) engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon customers or prospective customers, in violation of Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1)(A), (B) (2012);

b. While acting as a CTA, advertising in a manner which: (A) employs a device, scheme or artifice to defraud customers or prospective customers; or (B) involves transactions, practices or courses of business which operate as a fraud or deceit upon customers or prospective customers, in violation of Regulation 4.41(a), 17 C.F.R. § 4.41(a)(1), (2) (2016);

c. While acting as a CTA, presenting the performance of simulated or hypothetical trading in commodity futures without prominently displaying the disclosures required of a CTA in Regulation 4.41(b), 17 C.F.R. § 4.41(b) (2016);

d. While acting as a CTA, advertising in a manner which refers to a testimonial without prominently displaying the disclosures required of a CTA in Regulation 4.41(a)(3), 17 C.F.R. § 4.41(a)(3) (2016);

e. Cheating or defrauding, or attempting to cheat or defraud, customers and prospective customers in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated

contract market, in violation of Section 4b(a) of the Act, 7 U.S.C. § 6b(a)(1)(A), (C) (2012);

f. Directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly: (A) using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; (B) making, or attempting to make, untrue or misleading statements of a material fact or omitting to state material facts necessary in order to make the statements made not untrue or misleading; or (C) engaging, or attempting to engage, in acts, practices, or courses of business, which operate or would operate as a fraud or deceit upon customers or prospective customers, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a), 17 C.F.R. § 180.1(a)(1)-(3).

85. Defendants Parker and MYF are also permanently restrained, enjoined and prohibited from directly or indirectly:

a. Acting as a CTA or an associated person of a CTA (as those terms are defined in Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2012), and Regulation 1.3(aa)(4), 17 C.F.R. § 1.3(aa)(4) (2016), respectively), including by offering, promoting, selling, or otherwise engaging in activity with respect to trading systems or signals relating to commodity interests;

b. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity

interests (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2016);

c. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

d. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2016); and/or

e. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2016)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2016).

## V. RESTITUTION AND CIVIL MONETARY PENALTY

### A. Restitution

86. Defendants Parker and MYF shall pay, jointly and severally, restitution in the amount of eight hundred fifty-three thousand two hundred four dollars and ninety-eight cents ($853,294.98) ("Restitution Obligation"), plus post-judgment interest.

87. Pursuant to the Court's final judgment by default, permanent injunction, civil monetary penalties, and other statutory and equitable relief against Defendants Baggett, Changes Worldwide, and Changes Trading, entered February 1, 2017, Defendants Baggett, Changes Worldwide, and Changes Trading are jointly and severally liable with Defendants Parker and

MYF for four hundred ninety-eight thousand six hundred dollars and ninety-seven cents ($498,600.97) of the Restitution Obligation.

88.     Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2012).

89.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from Defendants Parker and MYF and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

90.     Defendants Parker and MYF shall make Restitution Obligation payments under this Consent Order to the Monitor in the name "Parker/MYF– Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, Attn: Daniel Driscoll, under cover letter that identifies the paying defendants and the name and docket number of this proceeding. Defendants Parker and MYF shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

91.     The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers identified by the CFTC or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customer is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth in Part V.B. below.

92.     Defendants Parker and MYF shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  Defendants Parker and MYF shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

93.     Within ten (10) days of the entry of this Consent Order, Defendants Parker and MYF shall release to the Monitor the one hundred ninety-three thousand dollars ($193,000) currently held in the client trust account of Defendants' attorney, Mark W. Puglsey at Ray Quinney & Nebeker, 36 South State Street, Suite 1400, Salt Lake City, UT 84111.

94.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants Parker and MYF customers during the previous year.  The Monitor shall transmit this report under a cover letter that

identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

95.     The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants Parker or MYF or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

96.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants Parker or MYF who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants Parker or MYF to ensure continued compliance with any provision of this Consent Order and to hold Defendants Parker and MYF in contempt for any violations of any provision of this Consent Order.

97.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants Parker's or MYF's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.      Civil Monetary Penalty**

98.     Defendants Parker and MYF shall pay, jointly and severally, a civil monetary penalty in the amount of three-hundred fifty-four thousand dollars ($354,000) ("CMP Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2012).

24

99.     Defendants Parker and MYF shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> DOT/FAA/MMAC/AMZ-341
> CFTC/CPSC/SEC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-7262 office
> (405) 954-1620 fax
> nikki.gibson@faa.gov

100.     If payment by electronic funds transfer is chosen, Defendants Parker or MYF shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants Parker or MYF shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants Parker or MYF and the name and docket number of this proceeding. Defendants Parker and MYF shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**C.     Provisions Related to Monetary Sanctions**

101.     Partial Satisfaction: Acceptance by the CFTC or the Monitor of any partial payment of Defendants Parker's or MYF's Restitution Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Consent Order, or a waiver of the CFTC's right to seek to compel.

# VI. MISCELLANEOUS PROVISIONS

102. Notice: All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Rosemary Hollinger (rhollinger@cftc.gov)
> Deputy Director
> Commodity Futures Trading Commission
> 525 W. Monroe St., Suite 1100
> Chicago, IL 60661

Notice to NFA:

> Daniel Driscoll, Executive Vice President, COO
> National Futures Association
> 300 S. Riverside Plaza, Suite 1800
> Chicago, IL 60606-3447

All such notices to the Commission or the NFA shall reference the name and docket number of this action.

Notice to Defendants Parker and MYF:

> Mark W. Puglsey
> Attorney for Defendants Parker and MYF
> Ray Quinney & Nebeker
> 36 South State Street, Suite 1400
> Salt Lake City, UT 84111

103. Change of Address/Phone: Until such time as Defendants Parker and MYF satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Consent Order, Defendants Parker and MYF shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten (10) calendar days of the change.

104. Entire Agreement and Amendments: This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to

amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

105. Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

106. Waiver: The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

107. Waiver of Service, and Acknowledgement: Defendants Parker and MYF waive service of this Consent Order and agree that entry of this Consent Order by the Court and filing with the Clerk of the Court will constitute notice to Defendants Parker and MYF of its terms and conditions. Defendants Parker and MYF further agree to provide counsel for the Commission, within thirty (30) days after this Consent Order is filed with the Clerk of Court, with an affidavit or declaration stating that Defendants Parker and MYF have received and read a copy of this Consent Order.

108. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendants Parker or MYF to modify or for relief from the terms of this Consent Order.

109.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendants Parker and MYF, upon any person under their authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants Parker or MYF.

110.    Authority: Defendant Parker hereby warrants that he is the manager of Defendant MYF, and that this Consent Order has been duly authorized by Defendant MYF and Defendant Parker been duly empowered to sign and submit this Consent Order on behalf of Defendant MYF.

111.    Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

112.    Contempt: Defendants Parker and MYF understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

113.    Agreements and Undertakings: Defendants Parker and MYF shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendants Kimball Parker and MakeYourFuture, LLC forthwith and without further notice.

IT IS SO ODERED at Salt Lake City, Utah on this 9th Day of May 2017.

_____
U.S. District Court Judge Bruce S. Jenkins

CONSENTED TO AND APPROVED BY:

_Kimball Parker_ (signature)

Kimball Parker    *1182 W. 1140 N.*
[insert address]    *PROVO, UTAH  84604*

Date: *March 07, 2017*


Approved as to form:

_Mark W. Pugsley_ (signature)

Mark W. Pugsley
Attorney for MakeYourFuture , LLC
Ray Quinney & Nebeker
36 South State Street, Suite 1400
Salt Lake City, UT 84111
(801) 323-3380
mpugsley@rqn.com

Date: *3/10/17*


Ashley J. Burden
Sr. Trial Attorney
Commodity Futures
525 W. Monroe St.
Chicago, IL 60661
(312) 596-0700
aburden@cftc.gov

Date: _____

30

CONSENTED TO AND APPROVED BY:

/s/ Ashley J. Burden

<table>
<tr><td>Kimball Parker<br>[insert address]<br><br>Date: _____</td><td>Ashley J. Burden<br>Sr. Trial Attorney<br>Commodity Futures Trading Commission<br>525 W. Monroe St.<br>Chicago, IL 60661<br>(312) 596-0700<br>aburden@cftc.gov</td></tr>
</table>

Date:

May 16, 2017

Approved as to form:

Mark W. Pugsley
Attorney for MakeYourFuture , LLC
Ray Quinney & Nebeker
36 South State Street, Suite 1400
Salt Lake City, UT 84111
(801) 323-3380
mpugsley@rqn.com

Date: _____